May it please the Court, my name is David Dockin. I am here today representing both Christopher Pratt and Deanna Chapin on an appeal from a denial of a motion to suppress in which three issues are before the Court today, the first of which deals with whether there was reasonable suspicion to affect a second stop of the vehicle that the appellants were in after an initial stop at the border. The second has to do with the voluntariness of a consent in this particular case. And the third, if it is found that the consent was not voluntary, whether probable cause existed to conduct a search of their vehicle anyway. I'll take up the reasonable suspicion portion of the argument first. In this case, the briefs set out that the appellants, Deanna Chapin, crossed a border at Port Hill, Idaho in October of 2002. And at that time was subjected to a border search after the border agent detected the order of marijuana in the vehicle, ran what is known as a text check, and discovered that approximately a month and a half earlier, this same appellant, Deanna Chapin, had been denied entry to Canada because she, according to the text report, had a substantial amount of marijuana. Now, the reason that the appellant was denied entry to Canada is because she had been denied entry to Canada. Now, the reason that the appellant was denied entry to Canada is because she had been denied entry to Canada. to attempt to support the reasonable suspicion for that stop. And that is the observance of two additional people in this vehicle. I thought another reason was how long it had taken her to get to that spot. And the record shows at the excerpts of records, I believe it's page 41 or 42, that the trial court attached no significance to that fact because of the fact that there was no evidence showing how long it would take to get from the border area to the point that the appellants were stopped. So what that leaves the government with is that single additional fact that there are more people in the vehicle. That's why they were stopped. One of the things that needs to be stressed in relation to that is the fact that even though there was a search conducted at the border, nothing was found. So this vehicle, as it proceeded down the roadway under the facts that existed at the point that the second stop occurred, was proceeding as if there was nothing in it. In other words, there was no evidence at that point. Where did you have the impression that the district judge did not apply, did not rely on the amount of time? Your Honor, I'm citing from the brief and the excerpt. I'm looking at what the judge said he relied on. And on page 125 of the record, he says, 6, the vehicle took over an hour to travel less than 30 miles with a speed limit of 60 miles per hour. While there is no evidence to how long it would normally take to travel, this tends to support the officer's reasonable inferences. And that's what I'm relying on, Judge. There's no evidence stating how long it would normally take to travel that route. Counsel, we know that the vehicle smelled strongly of marijuana at the border. And we know that the officers were aware that drugs were being smuggled across the border at non-official crossing points. And we know that there were additional people put into the car. Now, doesn't that at least give an opportunity to stop for some kind of reasonable suspicion and ask a question or two? In relation to that, in this instance, I'd like to point out that portion of the record concerning Officer Benson's experience in relation to border stops. Obviously, the lie is that training and experience is one thing that plays into reasonable suspicion to stop. Officer Benson's experience was virtually nonexistent. Except he said he had learned this from everybody in the area after he got there. He had learned from – I mean, I didn't quite imagine that that would happen. They would say, you know, how do people smuggle marijuana around here? Well, they walk – they send somebody in a car and they walk across the border. It's not very complicated. In response to that, Your Honor, I would say that he had been a Border Patrol agent in this area for two years. He had never stopped anybody and found marijuana in their car. And in only two instances had there been a stop where marijuana had been found in two years. I think that belies what he claims to have learned in this nonformal training. This was not formalized training. This was other Border Patrol agents simply saying, you know, this is how it works. I'm influenced by the fact that we've had other cases where exactly this happened. I mean, people have walked across the border with marijuana. Yes, and in this instance, Your Honor, we're talking about this particular officer and his training and experience, not other officers in other cases. Well, that's what I'm wondering. Why couldn't some community of experience be communicated to him? That's what he says has occurred. Right. And I get back to what I had said previously about that, Your Honor, and that is even though he says that's what occurred, his experience does not back that up. He had no experience with that at all. Only two instances where marijuana had been found and no real explanation of what those were about. This is a case where, again, I get back to the fact that there was no marijuana in that car when it was a search at the border. And when Officer Benson saw this vehicle traveling down the highway, it was not breaking the law. It was not doing anything. There were two other people in it. He had communicated to him that this vehicle was suspicious and the reasons why it was suspicious. And he then adds the fact that they've added some extra people to it and that it took them an unusually long time to reach this point. Is that not reasonable suspicion to stop and ask a question or two? In this instance where there has been the lapse of time and there has been 30 miles, you know, traveled, there are other explanations. But that's not a standard. Well, sure, but that would be what you'd ask a question about. And I believe that in this instance, it is a situation where. I understand that the question isn't whether there are other innocent explanations, but that is a factor I think that should weigh into it. In other words, he has they have a right to travel up and down this road. They have a free right of association. If they stopped along the way and picked up somebody else, of course, that's an explanation. Before this occurred, I see you can address the consent issue. I would like to address the consent issue. Thank you. The consent issue is one where the judge found two things that we especially disagree with here. One is that the defendants were not, they had not been seized, that the appellants had not been seized. In this instance, their driver's license, the driver's license of the driver had been taken, and we cited case law, Thompson and Attardi, which we believe supports the proposition, that a reasonable person under those circumstances would not believe that they are free to leave. Secondly, we feel that the fact that the court stated that the defendant knew that, defendant Deanna Chapin knew she had the right to refuse because she did refuse. Our position as set out in the brief is that that is not proof that she knew she had the right to refuse. There was no indication in the record whatsoever that anybody ever explained to her that she had the right to refuse, and every time that she did refuse, which was twice before in the third occasion she finally did agree and gave him the keys to get into the trunk, he continued to turn up the pressure. After the first refusal, she was ordered out of the car. After the second refusal, she was asked, what are you trying to hide? She had been separated from the people she was with. All of this led to a coercive atmosphere which directly affects whether this search could be considered voluntary. If we agree with you on the consent, was there probable cause at the time that they opened the trunk? No. The position is that there was not probable cause at the time they opened the trunk. Once again, we're in a situation where all that they had were two other people in this vehicle. Well, we know she lied when she said that they'd come across the border together. That's correct. And the position of the appellants in this case is the simple fact that she said something that did not coincide with what she said at the border is not enough. Especially what she said at the border. It's what they knew at the border. The people were not there. Yes. But it's not enough to rise to the level of probable cause. Okay. We'll give you a minute to rebuttal. Thank you. May it please the court. My name is Alan Burrow. I'm an assistant U.S. attorney with the District of Idaho assigned to the Boise office. And we have, of course, addressed the issues in the brief. And I don't want to belabor the points that the court feels satisfied with. And so I want to give the court an opportunity to just ask me any questions if you want me to address particular issues. Why did the district court belatedly issue another? Your Honor, I think I can't answer that question definitively. But it seems from the record that the Judge Lodge, who was the judge here, he issued a ruling which was very similar to the written order. Well, except he changed at least two important things, right? He changed the reasonable suspicion at the end to probable cause. And after it had been challenged in the appellant's brief that he applied the wrong standard. And it appears he did apply the wrong standard with regard to the actual search later on. Did he get a copy of the brief or did the government say maybe we better have some more here? I'm sorry, Your Honor. What was the question? Well, it seems suspicious that someone went to him and said, look, you got it wrong. You better give an analysis based on probable cause. Your Honor, I believe that the judge simply misspoke. I don't believe that he applied the wrong standard. Well, be that as it may, I'm talking about the subsequent opinion that he issued. Did he get a copy of the brief or did the government send him a copy of the brief? Your Honor, I can't answer that question. I was not the prosecutor. I apologize that I cannot answer it. I found no evidence in the record that the government had sent any kind of a brief or any kind of a signal to the court. The court has been made aware that the rulings are on appeal. It says he was made aware by somebody. It doesn't say who. Well, I believe, Your Honor, if I remember the record correctly, the judge stated that he was going to give the ruling from the bench, but that he was going to subsequently write a written order. He stated that from the bench. Is that a usual practice? I mean, I don't understand how he gets to do that in terms of a record on appeal consisting of what existed at the time of the notice of appeal. Well, Your Honor, I have seen judges actually do that quite frequently, and it seemed to me that it's a desire to communicate to the parties right then and there what the ruling is going to be and substantially how the judge is getting to that point, but recognize not — but needing to fold in the law and decide various cases and really — Well, certainly waiting to decide something, to write a written opinion is par for the course. But issuing a final judgment and then later, after the appeal has been taken and after the briefs have been filed, writing an opinion seems exceedingly odd to me. Well, Your Honor, I would simply submit that although it may seem odd, it is really without any consequence because I believe that the law of the circuit is that the judge's ruling may be upheld upon any ground. It may not — may or may not be a ground. I mean, you're probably right about that, but it really means that we just disregard this written order. Well, Your Honor, I don't think that Judge Lodge was doing anything nefarious. I just believe it was probably a matter of time. And then when he saw that it was going to be the issue on appeal that he needed to do what he had said he was going to do, which was issue a written order and to try to set out in finer points — in every case that's appealed from him. I mean, that's what struck me as unusual. I can't — I'm sorry. Well, maybe I'm overly cynical, but somehow he was letting know that he'd made a mistake and that it would be helpful if he would issue this revised analysis. Well, Your Honor, I don't know what to say to that. I can only say that I don't have a cynical view of it, and maybe it's because I know — I've practiced in front of Judge Lodge for quite a while, and it's hard to have a cynical view. You did not bring this to his attention. I'm sorry, Your Honor? You did not bring this to his attention. No, Your Honor. In terms of what would be useful for me to hear, I'd like to hear about the consent issue particularly. I'm sorry, Your Honor? The consent issue in particular. The consent issue. Your Honor, I believe that it's very important with regard to the consent issue to keep in mind what Ms. Chapin's position was. She testified at the suppression hearing. She did not testify that she had manifested consent but that that manifestation was involuntary. That was not her testimony. She was adamant that she never manifested consent at all, that she expressly denied consent and refused consent on at least three different occasions, and that the only way the officer got into the trunk of the car was by both officers putting their hands on their guns and one of the officers forcibly taking the keys out of her hand. That was her testimony, that there was no consent, period. And Judge Lodge made a credibility finding, basically, that her testimony was not true and that what the officers had testified to was what had happened, which is that there was confusion which arose initially over whether she had given consent to search the trunk. Initially, he asked a generic question, can he look, can he search the car, can he look in the car? And she had gestured and looked around and said, go ahead. He then asked her to pop the trunk. The agent's testimony was that she reached down as though she was going to do that and then she said something to the effect of either no or I can't do that, something to that effect. The officer was confused, thinking that she meant she could not pop it from inside the car, so he asked her to step out of the car and to open the trunk and she said something to the effect that I can't do that either. At that point. Judge Lodge was wrong or was he wrong about the fact that they were, quote, free to leave, despite the fact that their licenses were still valid? Your Honor, I do not believe he was wrong. I do acknowledge that that's a fairly close issue because of the driver's license and that's not something that was real definitive in the record. The agent testified that it seemed that he didn't think that he had given them the license back. Judge Lodge said that the fact that he may have kept the licenses did not mean that they were in custody. I would point out to the court that the testimony made clear that near where they were stopped, there was a cafe, the three-mile cafe. I think the law and the case law that's out there in this area tends to indicate that practical difficulties in leaving the scene, for example, being pulled over. But isn't the question that as long as a police officer is standing there with your driver's license and not giving it back to you, you have reason to think that you're not allowed to leave, not that you couldn't leave, that you're in detention? Right. And that certainly could be the case, Your Honor. All I can say here is that Judge Lodge is the one who heard all the testimony, observed the demeanor of the witnesses. There's lots of law in this license problem too, don't there? I'm sorry? We have several cases about the driver's license problem, all of which certainly maintain that somebody who, as long as the policeman is standing there with your driver's license having stopped you, that no reasonable person is going to think they can just walk away? Not because they couldn't physically do it, but because you're in detention. Somebody's... But I would point out that there are also opinions, for example, the Bramble opinion, where the person basically is not technically under arrest, but that's only because the officers have said we're not going to arrest you right now. But pretty clearly the person is sitting in their home. They're not really free to leave. In fact, the defendant was handcuffed during the search for officer safety reasons, and furthermore, the officers told the defendant in that case that if he did not consent, that they were going to go get a search warrant and it could take several hours to do it. And the court specifically found that the reason why he consented was he was concerned for the health of his dog who was out in the car and if it's going to take several hours. But under the totality of the circumstances, this court ruled that consent was voluntary in that situation, under the totality of the circumstances. Let's look at the totality of the circumstances here. They're demanding that that trunk be opened. They've separated the people, even their driver's licenses. And they say, okay, well, we'll go. Let's hop in the car and leave. I mean, that's just not real life. Well, Your Honor, I think, though, that they were not demanding that the trunk be opened. I think the testimony was that he asked her after the confusion had arisen over the trunk. How many times did they ask? I guess you could say that they asked two or three different times. It was after Joseph Chapin had become hostile. That's what prompted the officer to get everybody out of the car was because he had become hostile and there was some clothes and stuff laying in the back seat. But then the officer testified that he asked Ms. Chapin, what are you trying to hide? She said, nothing. And he said, look, are you going to let me look in the car or not? And that's the way he put the question to her. And she said, go ahead and gave him the keys and he opened the trunk. But I do believe that Judge Lodge is correct here that, in certain respect, the consent issue is academic because I think that the officer certainly had probable cause by that point to look in the trunk. As soon as he opens the trunk, he has the smell, the odor of marijuana, and the trunk, which was empty at the border, is now completely full. And at that point, I think he had certainly probable cause to go in the trunk. And once he sees it's full and smears the marijuana, he certainly has probable cause to go into the bags which are in the trunk. Thank you very much, Your Honor. Thank you, Your Honor. May I have a minute? Your Honor, you may have a minute. I started talking. You may have a minute. Thank you. There were three requests made, and the hostility of Joseph Smith or Joseph Chapin, in this case, was that he simply was asserting his rights. He said, what are you stopping us for? Why are we stopping you? The officer took that as hostility and ordered his mother out of the car. One thing I'd like to point out of the record, which I don't think was pointed out well enough in the briefs, but it is there. When the officer wrote his report and related what had been said to him about the refusals to allow the search, he capitalized the words no in both occasions when it was related. In other words, he tried to softball that refusal a little bit in his testimony, but not in his report. At the time that he wrote the report, it's clear that the way that she said that had some significance to him. And our position, we posit to the court that it was an unequivocal refusal. This is a totality of the circumstances analysis when it comes to analyzing this voluntariness issue. And it's our position. Do you know anything more about how this opinion came to be written? I have no idea. Judge, I'm a little cynical about it myself, frankly, because the one thing that did come up is that the government never argued probable cause at the suppression hearing. That never came up until Judge Lodge entered a ruling, said there was reasonable suspicion to search the trunk, and then later wrote a written opinion after the first appellant brief was filed stating there was probable cause. But do you have any reason, I mean, to think that your opponent is not correct, that we're looking at the probable cause issue, that's a de novo issue, and it doesn't really matter what Judge Lodge found? Your Honor, I'm not prepared to answer that definitively, but I believe that is correct. I think it is a de novo issue. Thank you very much. Thank you. The case of United States v. Pratt and Chapin is submitted, and we thank the counsel for their arguments.
judges: B. Fletcher, Hamilton, Berzon